## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **NATIONAL COLLEGIATE RUGBY INC.** | § | |
| *Plaintiff*, | § | |
| | § | |
| **V.** | § | **CASE NO. 1:25-cv-269** |
| | § | |
| **JAMIE MCGREGOR, INDIVIDUALLY AND** | § | |
| **AS DIRECTOR OF TRAINING & EDUCATION** | § | |
| **FOR USA RUGBY AND THE UNITED STATES OF** | § | |
| **AMERICA RUGBY FOOTBALL UNION LTD.,** | § | |
| **D/B/A/ USA RUGBY** | § | |
| *Defendants*. | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff, National Collegiate Rugby Inc. (hereinafter sometimes referred to as "NCR" or Plaintiff), and files this complaint against Defendants Jamie McGregor and The United States of America Rugby Football Union Ltd. d/b/a/ "USA Rugby" (hereinafter sometimes collectively referred to as "Defendants" or "USA Rugby") seeking injunctive and declaratory relief and damages for their violations of both federal and state laws and/or controlling policies of World Rugby, the United States Olympic & Paralympic Committee and its own policies, tortious interference in their business relationships and/or contracts, defamation, fraud and deceptive trade practices. In support thereof, Plaintiff respectfully submits the following facts and claims to be shown at trial:

### I.    INTRODUCTION

1.    The claims and facts set forth in this Complaint will prove that, in clear violation of the Ted Stevens Act, 36 U.S.C.A. 220501 *et seq*. and applicable state laws, USA Rugby's has and continues to illegally and fraudulently propagate false and defamatory statements against NCR, its

members and its contracted officials in a campaign designed to accomplish either a hostile takeover of NCR or its destruction. The motive behind this attempted power grab is simple, USA Rugby continues to be in desperate need of increasing its revenues and has targeted NCR's membership dues and sponsorship/grant monies.

2.     The crux of the matter centers around USA Rugby publishing false and defamatory statements regarding NCR's allegedly "unsanctioned" matches which gave the impression that NCR, its members and contracting officials were acting in an authorized manner and/or were unqualified. These intentional statements fraudulently omitted the whole truth surrounding their spurious claims. USA Rugby was well aware that federal law, the Ted Stevens Act 36 U.S.C.A. 220501 *et seq*., gave NCR exclusive jurisdiction over its competitions because it is a recognized amateur college athletic organization and, as such, USA Rugby had never had any jurisdiction over NCR's domestic competitions. With this knowledge, USA Rugby had an affirmative duty to advise all concerned of these undisputed facts and cease and desist from their ongoing false statements.

3.     USA Rugby's defamatory statements went well beyond the false claim that NCR's matches were "unsanctioned". These additional defamatory statements included, but are not limited to, that NCR's events are not safe, NCR does not comply with the Safe Sport Act, and NCR does not have established disciplinary policies

4.     The facts will also show that USA Rugby's ongoing pursuit of power over NCR, including NCR's financial resources, is both illegal and a complete abandonment of rugby's historic principles and sense of community.

5.      Beyond this abandonment of core principles, USA Rugby's threats of retaliation and defamatory statements against referees who contract to provide services to NCR directly impact both the referees' and NCR's constitutionally protected rights, such as freedom of association.

6.      USA Rugby's pursuit of power over NCR is a reminder of the prophetic nature of Lord Acton's famous 1887 quote: "Power tends to corrupt, and absolute power corrupts absolutely." Here, USA Rugby's attempted power grab clearly violates federal law, state law, established rugby policies and is in direct contravention of its duties and responsibilities as a national governing body.

7.      NCR's pursuit of the claims in this Complaint was only undertaken after multiple years of NCR trying to amicably resolve the issues and USA Rugby's failure to accept reasonable terms. Only after these efforts to resolve the issues had failed was NCR forced to seek judicial intervention.

8.      The facts and claims, set forth here and to be shown at trial, will show the depth and breadth of USA Rugby's public and private campaign of intentional disinformation, tortious interference, fraud by omission, deceptive trade practice and defamation against NCR and its officials.

9.      Contrary to the expected public assertions of victimhood or innocence by USA Rugby, the facts set forth below and at trial will clearly show that USA Rugby is far from the "victim" or innocent but, rather, will be shown to be the perpetrator of disinformation and falsehoods about NCR, its members and its officials.

        (a)      Plaintiff, National Collegiate Rugby Inc. ("NCR") is a Delaware non-profit corporation which provides various rugby related services to its member colleges and players, including but not limited to membership, training, tournaments and national championships. NCR's principal place of business is Wilmington, Delaware.

(b)    NCR is the successor corporation to National Small College Rugby Association ("NSCRO") which was founded in 2007 and recognized by USA Rugby in 2012. Both corporations were modeled after other independent college athletic organizations, such as NCAA. NCR was formed in 2020 as an independent college rugby organization to provide rugby related services, such as insurance, membership and holding various tournaments and/or championships, as well as All Star events. NCR has over 630 member colleges/universities and over 18,000 players, coaches, and administrators located throughout the lower 48 states, including Texas.

(c)    From NSCRO's formation in 2007 through NCR's current operations, NCR and NSCRO have always been separate and independent, amateur college rugby organizations.

(d)    Until the recent events outlined in this Complaint, NSCRO and then NCR worked in a cooperative manner with USA Rugby, the national governing body for amateur rugby in the United States, including reaching contractual agreements for various rugby related matters and services, including membership and insurance services.

(e)    In the time frame before USA Rugby filed for bankruptcy protection in March of 2020, the relationship between NCR and USA Rugby had worked with the exceptions of a variety of issues described below. *See In Re: USA Rugby*, Ch-11-20-10738 (Bank. C Del).

(f)    Prior to USA Rugby filing for bankruptcy protection, NSCRO had noticed a number of major financial discrepancies with USA Rugby under its agreements with NSCRO, including but not limited to the improper and unauthorized retention, misappropriation and intentional diversion of funds owed to NSCRO and/or other rugby groups which, in total, were in excess of approximately $800,000.

(g)    Prior to filing for bankruptcy, NSCRO had attempted numerous times to have USA Rugby pay NSCRO all of the funds owed under their agreements but none of those efforts were successful. Eventually, USA Rugby advised NSCRO that the money it was owed had been diverted and spent on "other" expenses. During this time frame, it became readily apparent to NSCRO and the wider rugby community that, not only had USA Rugby shown a complete lack of transparency or financial management skills, it had intentionally hidden its dire financial situation from NCR and/or the national rugby community.

(h)    After USA Rugby filed for bankruptcy protection, NSCRO filed a claim to protect its interest, including for the recovery of the money owed to it by USA Rugby which totaled $197,000.

(i)    Prior to bankruptcy, USA Rugby paid NSCRO some of the funds due under their agreement after USA Rugby received funding from World Rugby, the global governing body for rugby. USA Rugby did not pay NCR all of the funds that it was owed.

(j)    Prior to USA Rugby's bankruptcy filing in March of 2020, USA Rugby reorganization committee had advised NSCRO to continue to operate independently and recommended that NCR obtain its own insurance and establish its own membership system.

(k)    Defendant Jamie McGregor is the Director of Training & Education at USA Rugby National Office, his office is in Denver, Colorado, and can be served at 501 S. Cherry St. Ste. 100, Denver, CO 80246.

(l)     Defendant USA Rugby is based in Colorado, with its principal place of business at 501 S. Cherry St., Ste. 100, Denver, CO 80246. USA Rugby can be served through either its principal place of business or through its registered agent, Delaware Corporate Services Inc., 919 North Market St., Ste 725, Wilmington, DE 19801.

(m)     Additional relevant parties outside and within USA Rugby may include Justin X. Hale, Christopher Chopra Micheletti, the past and present members of USA Rugby's Board of Directors, the past and present officers and/or employees of USA Rugby, past and present members of USA Rugby's College Council and College Rugby Association of America (CRAA).

## II.    JURISDICTION

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because of federal questions arising from the needed judicial interpretation of the scope and authority of USA Rugby over NCR, its' members and its referee contractors under the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C.A. 220501 et seq (hereinafter sometimes referred to as either the "Ted Stevens Act" or "Act"). NCR also seeks interpretation of USA Rugby's and World Rugby's policies under the Act. The amount in controversy exceeds $75,000, exclusive of interest and costs.

11.    Plaintiff NCR is a Delaware non-profit corporation with principal office in Wilmington, Delaware.

12.    Defendant Jamie McGregor is a resident of the State of Colorado and believed to be a citizen of Australia.

13.    Defendant USA Rugby is a Delaware non-profit corporation that maintains its principal place of business in Glendale, Colorado.

14.     Plaintiff has suffered and will suffer financial and non-financial damages as a direct result of Defendants' actions and inactions which are current and ongoing, including:

15.     Financial Losses: The financial losses caused by USA Rugby's actions include but are not limited to the increased travel costs of referees due to local referees declining contracts because of the threats and intimidation, the attorney fees and cost of having to pursue this litigation, and other damages to be shown at trial.

16.     Reputational Harm: NCR continues to suffer reputational harm due to USA Rugby's past and ongoing defamatory statements including but not limited to illegally claiming that NCR's matches, tournaments and championships are "unsanctioned" and others to be shown at trial, including but not limited to other defamatory statements regarding the safety of NCR matches, compliance with the Safe Sport Act, establishment of disciplinary processes

17.     Other Damages: Any other special and/or exemplary damages allowed by law.

18.     Applicable Law: The application of the law of the forum and, as needed and/or in the alternative, the application of the laws of Canada, Delaware and/or Colorado.

19.     Venue is proper in this Court under 28 U.S.C. § 1391 because NCR has over eleven member colleges/universities and their players and coaches located in Texas. These Texas colleges regularly play matches in Texas in the spring and fall under the auspices of NCR. NCR holds one of its annual National Championships  in Houston, Texas. NCR also conducts training/education in Texas. NCR has and continues to contract and/or attempt to contract for referee services to be provided in Texas.

## III.     STATEMENT OF FACTS

20.     The following facts, as well as others to be shown at trial, demonstrate a current and an ongoing and intentional pattern of illegal, tortious, defamatory and deceptive conduct by USA

Rugby; all of which violate the federal law, state laws and/or controlling policies, culminating in substantial harm and damage to NCR.

21.    NCR's Exclusive Jurisdiction: NCR's claims in large part arise from USA Rugby's failure and intentional refusal to follow the clear provisions of the Ted Stevens Act. 36 U.S.C.A. 220501 et seq. The Act's applicable provisions include but are not limited to the specific statutory limitations of USA Rugby's jurisdiction over NCR, as an amateur college athletic association, and USA Rugby's wrongfully claimed sanctioning authority over NCR matches, tournaments and/or championships. Pursuant to the terms of the Act, NCR has "exclusive jurisdiction" over its domestic matches, tournaments, championships and operations.

22.    The Ted Stevens Act was passed in 1978 and revised in 1998 in order to address various issues arising from Olympic and international amateur athletic competitions. Pursuant to the express provisions of the Act, the United States Olympic and Paralympic Committee ("USOPC") was the designated national corporation to oversee these matters. Likewise, the Act allows for the formation of national governing bodies for each amateur sport which participate in the Olympics and/or international amateur athletic competitions.

23.    Pursuant to the terms of the Ted Stevens Act, USA Rugby was designated the national governing body ("NGB") over "international" amateur rugby, even though at the time rugby was not an Olympic sport. Subsequently, rugby returned as an Olympic sport for the games in Brazil in 2016. As part of this NGB designation, USA Rugby's bylaws specifically adopted and incorporated the provisions of the Act.

24.    Section 220523 of the Ted Stevens Act addresses the authority of USA Rugby, as an NGB, to have jurisdiction and sanctioning authority over "international" amateur athletic activities or competitions. 36 U.S.C.A. 220523(a) (4). However, this authority is specifically limited by the

Act which states "*except* amateur athletic competitions *under Section 220526*." 36 U.S.C.A. 220523(a)(5) (emphasis added).

25.    To fully understand the limited scope of USA Rugby's jurisdiction and their false narrative that they have jurisdiction over NCR, one needs to also look at the definitions of the Ted Stevens Act, 36 U.S.C.A. 220501(b). The Act defines a key term impacting NCR's claims as follows: "international amateur athletic competition means an amateur athletic competition between one or more athletes **representing the United States**, individually or as a team, and one or more **athletes representing a foreign country."** 36 U.S.C.A. 220501(b)(8) (emphasis added). Simply put, the clear intention of the Act was to address athletic competitions between teams and/or players who are representing their nations.

26.    It is undisputed that NCR, its member colleges and member players do not represent the United States nor do they have matches against foreign national teams, unless selected to be on our national teams. Likewise, any athletic competitions between NCR member colleges with foreign rugby teams who are not representing their country, such as foreign colleges and/or club teams, do not fall within the Act's limited jurisdiction granted to USA Rugby. Despite this limiting language, USA Rugby has and continues to demand that it has sanctioning authority over these non-national teams competitions.

27.    Section 220526 of the Ted Stevens Act restricts the jurisdiction of USA Rugby over amateur college athletic competitions and states "(a)n amateur sports organization that conducts amateur athletic competition *shall have exclusive jurisdiction over that competition*, if participation is restricted to a specific class of amateur athletics, such as high school students, college students, members of the Armed Forces or similar groups or categories." 36 U.S.C.A. 220526(a) (emphasis added).

28.     Section 220525 of the Ted Stevens Act does grant USA Rugby sanctioning authority but only over "international" amateur athletic competitions. The Act does not grant any sanctioning authority to USA Rugby over domestic amateur college competitions. In fact, the Act does just the opposite because it precludes USA Rugby from even attempting to exercise jurisdiction over NCR's domestic competitions, including championships and/or competitions with NCR colleges and foreign teams, who are not the national team.

29.     Despite the clear language of the Act, USA Rugby, primarily through Jamie McGregor, has made and continues to make multiple false, fraudulent and misleading verbal and/or written statements,  began in 2021 and continues to the present to multiple referees, including Christopher Micheletti, Justin Hale, the members of the USA Rugby Referee & Law committee and others, including Rugby Canada, World Rugby and Major League Rugby that NCR's events were "unsanctioned" and by direct or indirect inference left the false impression that the NCR events were disqualifying and/or unprofessional and/or NCR did not have sanctioning authority. The motive behind these false and misleading statements was to threaten and/or intimidate the referees and dissuade others from recognizing NCR as a legitimate rugby organization.

30.     When Jamie McGregor and/or USA Rugby are making these defamatory statements, they knew and/or should have known that labeling NCR events as "unsanctioned" without disclosing NCR's exclusive jurisdiction over its events under the Act would leave a false impression and intentionally mislead people and organizations. As a result, they had an affirmative duty to disclose NCR's exclusive jurisdiction and sanctioning authority. They also had a duty to disclose that USA Rugby's lacked jurisdiction over NCR's competitions. Moreover, if Jamie McGregor and/or USA Rugby were unaware of the Act's impact at the time of making any of these defamatory statements, they were obligated to correct their prior false statements after they learned of the Act's impact.

But, at no time, did Jamie McGregor and/or USA Rugby advise anyone of the Act's "exclusive" jurisdiction provisions for NCR or take any steps to correct any false impressions they had made.

31.     Beyond Jamie McGregor, USA Rugby's CEO, COO and Board members had the same duty to disclose these factual omissions when they learned of the Act's provisions; all of which occurred no later than the mediation which took place in Washington DC October 2021 and/or when they received NCR's cease and desist letter June 2023.

32.     USA Rugby's intentional silence regarding the complete truth about the limitations of their authority and NCR's exclusive jurisdiction allowed it to mount a baseless attack on NCR to achieve their goal of trying to force NCR to capitulate. Their collective failures to fully advise the wider rugby community and the specific recipients of the defamatory statements and incomplete nature of these statements amounts to fraud by omission and/or fraud.

33.     USA Rugby may attempt to raise as a defense that the Ted Stevens Act preempts NCR's state law claims by arguing that the Act does not allow a "private right of action" against the USOPC and, allegedly by association, USA Rugby. 36 U.S.C.A. 220505(b)(9). This section, however, only applies to the USOPC and only for its actions arising under the Act. More importantly, if raised by USA Rugby, this defense/argument is misleading at best because in the same section of the Act regarding the USOPC, as the "corporation", clearly states that **"(n)othing** in this <u>subsection</u> ***shall be construed to preempt or otherwise abrogate*** the duty of care of the ***corporation under state law or common law***, 36 U.S.C.A. 22505(d)(3) (emphasis added). As for a national governing body ("NGB"), such as USA Rugby, this limitation language also applies to USA Rugby, except that the limitation applies to the entire "section" dealing with the NGB's authority and duties. 36. U.S.C. 220524(b).

11

34.     Except as specifically set forth in this Complaint, nothing in this Complaint should be construed as an attempt by NCR to contest USA Rugby's authority under the Ted Stevens Act over "international" matches or championships or tournaments or any eligibility to play or officiate in such "international" competitions. However, NCR does specifically claim that USA Rugby's actual and ongoing threats that officiating NCR matches will bar any referees from eligibility to participate in the developmental pathway for referees to qualify for international and USA Rugby matches violates the Ted Stevens Act, as well as World Rugby/USOPC/ USA Rugby's policies.

35.     In particular, USA Rugby's authority over "eligibility" for officiating or playing in "international" matches require it to comply with the laws of the United States and these policies. Simply put, USA Rugby's eligibility procedures for rugby officials cannot violate the Ted Stevens Act or other laws or policies. One glaring example of USA Rugby's violation of the Act is the spurious threat to referees that officiating an NCR event acts as a bar to any USA Rugby or international matches.  As a result of these ongoing threats and violations, NCR seeks declaratory and injunctive relief, as well as damages.

36.     By way of background, individual rugby referees are members of their local and/or national referee organizations. There are a number of such referee organizations around the country and around the world which supply referees to various amateur rugby organizations, including youth, high school, college and adult clubs. The referees are required to receive training which conforms with World Rugby standards. This training can be provided by either USA Rugby, as the NGB, or NCR, as an amateur athletic organization.

37.     NCR anticipates that USA Rugby will attempt to argue that its actions raised in this Complaint simply follows the mandates and authority granted to it by World Rugby, including its

alleged authority to sanction NCR matches and championships and, therefore, it has authority to interfere in NCR's operations regarding referees or other matters. This argument is meritless.

38.   World Rugby is the international governing body for the sport of "rugby union" football which is one version of rugby. World Rugby traces its origins back to 1886 and through its current iteration formed in 2014. USA Rugby, as an NGB, is a member of World Rugby.

43. As shown below, World Rugby has become an integral part of USA Rugby's campaign to spread lies and misinformation about NCR, as well as using these falsehoods to directly impact NCR and its members.

39.   NCR submits that, as early as May 2020, World Rugby knew or should have known of NCR's position as an amateur college athletic sports organization under the Ted Stevens Act which granted NCR "exclusive" jurisdiction over its competitions, including sanctioning. Despite this knowledge, World Rugby not only chose to ignore the provisions of the Ted Stevens Act but also failed in its own duty to disclose the whole truth of NCR's "exclusive" jurisdiction. As a result, World Rugby became complicit in the conspiracy to propagate USA Rugby's deceit and defamatory statements. And, while World Rugby should be able to rely on a national governing body to follow its national laws and USA Rugby's representations, any reliance must be tempered with World Rugby's own requirement of due diligence. This due diligence should have included a more detailed investigation into the laws of the United States and their impact on the NCR claims and/or USA Rugby's defamatory statements and tortious conduct. This diligence should have increased dramatically after World Rugby was specifically informed that the Ted Stevens Act gives "exclusive" jurisdiction over amateur college rugby competition to NCR. Upon learning of USA Rugby's statements being false and not including a discussion of the "exclusive" jurisdiction language of the Ted Stevens Act, World Rugby had its own affirmative duty to reveal the whole

truth. Instead of recognizing the impact of the Ted Stevens Act on the NCR dispute, World Rugby has chosen and continues to choose to deflect all of the responsibility at USA Rugby. However, World Rugby has its own responsibility to not propagate USA Rugby's defamatory statements and tortious conduct or rely on these false statements to directly interfere in NCR's competitions and/or its members. For example, evidence at trial will show that World Rugby representatives have contacted various referees and told them to not officiate NCR events because of the ongoing dispute between NCR and USA Rugby over the scope of jurisdiction and sanctioning of NCR events.

40.    USA Rugby's reliance on its membership with World Rugby and its rules/laws, as the basis for its claimed jurisdiction over NCR, is nothing more than disinformation and a diversion from reality. The Ted Stevens Act clearly controls the limits and scope of USA Rugby's jurisdiction and authority over NCR. Moreover, World Rugby's own policies specifically state that its rules and policies do not override a local jurisdictions laws and/or regulations. ***W.R. Regulation 3***. Accordingly, the USA Rugby argument that it was just following World Rugby policies argument is meritless.

41.    USA Rugby may also attempt to make the spurious argument that its actions were not intentional because it "justifiably" relied upon and followed World Rugby policies and rules to take the actions set forth in this Complaint. Once again, this argument ignores the clear and unequivocal limiting language of the Ted Stevens Act. Ignorance of the law is no defense. Here, NCR submits that USA Rugby was not ignorant of the law but, rather, intentionally chose to ignore it.

42.    Any argument or defense of "ignorance" of the Ted Stevens Act's provisions is completely dispelled by NCR's cease and desist letter of June 12, 2023. In response to this letter, USA Rugby

intentionally chose to ignore the law and NCR's request that it stop the defamatory and tortious interference and, rather, continued its illegal, ongoing tortious and defamatory conduct.

43.    In the summer and fall of 2019, it became apparent to NSCRO/NCR and the wider rugby community that USA Rugby had developed serious financial issues due to gross mismanagement. Subsequent investigation by NSCRO/NCR and others showed the financial mismanagement was, in large part, the result of lack of fiscal controls which led to excessive overspending beyond established budgets, including by the men's high performance international teams and untenable outside financial investments. As these major financial issues became more apparent, USA Rugby chose to evade detailed responses and attempted to hide the sources of the financial problems, as well as scapegoat one of its employees. This investigation eventually revealed that USA Rugby had intentionally, and illegally misappropriated funds owed to NCR and other community rugby groups and members which all together are believed to have exceeded $800,000. During this time frame, USA Rugby stopped making monthly payments to NCR under their agreement. By the time of bankruptcy, USA Rugby still owed NCR over $197,000.

44.    In preparation for filing for bankruptcy reorganization protection, USA Rugby substantially revised its bylaws in March 2020 which, in part, modified its internal structure by forming various community councils, including a "College Council." USA Rugby's College Council's duties and authorities are outlined in the revised bylaws. In turn, USA Rugby and the councils executed "Community Service Agreements" to govern their relationship. The councils were also supposed to adopt "Terms of Reference" for their own processes and procedures. From these documents and some of the facts in this Complaint, the "College Council" is shown to be an integral part of USA Rugby and, as such, council's acts or omissions can be directly attributed to USA Rugby.

45.    During the USA Rugby bankruptcy proceedings, from March 2020 until approval of reorganization plan in September 2020, USA Rugby advised NCR that it should seek out its own insurance and take steps to establish its own membership system. Couple this advice with the newly revealed major financial mismanagement issues caused NCR to obtain its own insurance, established its membership system and take steps to ensure its independent status.

46.    During the bankruptcy, USA Rugby provided sworn declarations to the court that the financial plan for reorganization specifically did not include any projected revenue from NCR and/or its members.

47.    During bankruptcy, USA Rugby relied heavily on financing from World Rugby to continue to operate and, as a result, World Rugby became one of the primary creditors of USA Rugby.

48.    During and subsequent to bankruptcy, USA Rugby suffered substantial reduction in revenues due to the Covid 19 pandemic and its resulting impact on membership dues, as well as a reduction in grants and/or donations. Additional lost revenue occurred as a result of NCR withdrawing from the prior 2019 MOU agreement with USA Rugby.

49.    Leading up to and subsequent to the acceptance of the reorganization plan, USA Rugby realized that it still did not have sufficient income or revenue to operate, much less meet the repayment terms under the reorganization plan.

50.    As a result of this realization and on information and belief, USA Rugby decided that it needed to increase its income, including increasing  membership dues and other income sources. In a classic "all about the money" scenario, USA Rugby decided it needed to have NCR member teams and players  join USA Rugby as full members so that it could collect dues from the over 600 college teams and their thousands of players.

51.     In addition to increasing membership dues, USA Rugby's strategy of threats and intimidation were clearly aimed at recapturing NCR's other sources of income, including tournament fees, TV and streaming services income and sponsorship income from major events. For example, the College Rugby Championship ("CRC") is a long running national rugby college tournament run by NCR which is both televised and streamed, as well as sponsored by major companies. This object of USA Rugby's desire is shown in part by the evidence that Defendant McGregor directed many of his threats against referees for "high profile" NCR events, such as the CRC or other broadcast events, and did not threaten retaliation against referees for officiating NCR's regular conference matches. NCR submits that these selective threats were both intentional and designed to maximize USA Rugby's efforts at disruption.

52.     Another goal of this campaign of threats, defamation and intimidation was to allow USA Rugby to claim to World Rugby and various financial sponsors that it represents all rugby in the United States and, especially, U.S. colleges. For example, the financial motive of these threats is shown by various USA Rugby's false media releases and other documents in which it claims to represent over 900 colleges and over 32,000 college players/coaches as members. This is a gross exaggeration of the actual college numbers. The College Council includes representatives from the two college groups, NIRA and CRAA, who are USA Rugby members. Combined, these two associations proclaim 135 college members which would equate to approximately 4,000 players, coaches and administrators. A far cry from USA Rugby's media claims.

53.     On the other hand, if USA Rugby was able to force NCR and its members to rejoin, then the college numbers would increase by over 600 colleges and over 18,000 players, coaches and administrators.

54.    Another financial motive arising from trying to increase the college numbers is the fact USA Rugby, Rugby Canada and Federation of Mexico Rugby Union have collectively been designated as the co-hosts for the 2031 Rugby World Cup. As part of their preparation for hosting the Rugby World Cup, World Rugby requires its host countries to make every effort to increase their development of rugby and increase their membership. Likewise, increased college membership numbers have a substantial financial impact on both sponsorships and media revenue.

55.    To achieve this hostile takeover of NCR and since USA Rugby could not force NCR or its members to join, it decided to employ a series of tactics designed to try and force NCR to abandon its independent status and force its 18,000 members to  join USA Rugby or cease to exist. One such tactic was the illegal threats made to referees who had officiated NCR events. Another tactic was to demand unwarranted and highly excessive sanctioning fees for NCR major events, including a $60,000 sanctioning fee demand for the CRC. Another tactic was to continuously and intentionally interfere with NCR's business relationships and contracts, as well as those relationships with its member colleges.

56.    Another especially spurious tactic was to issue multiple defamatory statements about NCR's alleged "unsanctioned" events to the wider rugby community, including media outlets, Rugby Canada, World Rugby and others; all of which were designed to make NCR a pariah of the national and global rugby communities and to deny broader opportunities to NCR and its members

57.    The extent of the impact of these defamatory statements is shown by USA Rugby's use of World Rugby and others to propagate these falsehoods, disinformation and use them to justify their tortious interference with NCR and its members.

58.    Before, during and after the USA Rugby bankruptcy, NCR made numerous efforts to try and reach a compromise with USA Rugby. However, the efforts failed in large part due to USA

Rugby's insistence that any form of a relationship between the two would require NCR and its members to join USA Rugby and/or pay significant membership dues.

59.    One of the examples of NCR's many efforts to reach an amicable resolution was the private mediation between USA Rugby and NCR in Washington D. C. on October 24, 2021. In attendance were the CEO, Chairman of the Board and members of the College Council of USA Rugby, NCR and World Rugby. The agreed mediator was Bill Goren, who at the time was a deputy commissioner of Major League Rugby, and is now the CEO of USA Rugby. At the conclusion of this mediation, the parties reached a proposed solution which had four parts, including a partial/limited membership of NCR.

60.    Despite the proposed agreement and understanding that would act as a settlement and resolve the dispute, USA Rugby claimed that it had to seek the approval of its College Council. Subsequently, the College Council rejected the settlement proposal without logical explanation to NCR **a**nd, then, USA Rugby claimed that there was nothing it could do.  USA Rugby's claim that it was bound by the College Council's decision is also without merit. Nothing in the USA Rugby bylaws grants any settlement authority to the College Council. Moreover, the bylaws grant the USA Rugby's Board the power to rescind any portion of the College Council's authority and then reinstate it  as needed. Simply put, USA Rugby's Board could have overridden or bypassed the College Council but chose not to. Alternatively,  the USA Rugby Board could have simply told its College Council to comply with the law but they chose not to.

61.    Another example of NCR's efforts to resolve this matter was through its contact with USA Rugby's Referee and Laws Committee, who sent the USA Rugby Board a detailed proposal which could have led to a settlement. However, the Board's response was in effect "we'll look into it" but for now there will be no change in policy.

62.     While the various attempts to reach a resolution to have NCR rejoin USA Rugby's membership were ongoing, USA Rugby continued with its tactic to try and force NCR to rejoin by threatening referees that they would not be allowed to officiate any USA Rugby sanctioned matches or be able to participate in the developmental pathway for referees if they continued or tried in the future to officiate NCR's matches, including championships.

63.     Starting in January 2021 and continuing through the date of filing this Complaint, USA Rugby, in an ongoing pattern of intentional intimidation, has threatened and continues to threaten numerous referees that, due to the alleged unsanctioned status of NCR matches, officiating NCR matches, tournaments and/or championships would bar them from officiating USA Rugby and/or domestic or international matches and/or participation in the developmental pathway for international matches. These threats had and continue to have a substantial chilling effect on many referees which resulted in a large number of referees declining NCR's contractual offers to officiate its matches. These threats have and continue to result in interfering with NCR's business relationships and contracts with various referees. Two of the many examples of this intentional pattern of misconduct toward referees are provided by Justin X. Hale and Christopher Chopra Micheletti.

64.     The eligibility threats made against the various referees also violated USA Rugby's policies arising from the obligations of the Ted Stevens Act and World Rugby/USOPC policies by failing to provide proper written notice of the alleged eligibility infractions and an opportunity to be heard. None of the impacted referees were neither given the proper written notice nor the opportunity to have a hearing.

65.     NCR further submits that USA Rugby's failure to follow these policies was intentional because Defendant McGregor, the primary purveyor of these threats, was well aware and/or should

have been fully aware that, under USA Rugby's policies, had proper notice of the alleged eligibility infractions been given and the referees been given an opportunity for a hearing, the hearing would have resulted in a ruling favorable to the referees' eligibility for all matches and/or pathways. The evidence will show that, despite USA Rugby's procedures, none of the threatened referees were given proper notice and/or an opportunity to participate in a hearing.

66.    The impact of USA Rugby's violations of these laws and policies is not confined to NCR or referees but also includes NCR member colleges and the wider rugby community.

67.    Despite its knowledge of the limitations of its jurisdiction under the Ted Stevens Act and the "exclusive" jurisdiction of NCR over its matches, USA Rugby has illegally, intentionally and continuously defamed NCR, as well as intentionally interfered with NCR's business relationships, contracts and/or potential contracts. All of McGregor's actions have been and continue to be approved by USA Rugby, especially its officers, board of directors and members of its College Council.

68.    Also, despite USA Rugby's knowledge of the Ted Stevens Act, it intentionally chose to omit from any of the multitude of defamatory statements the whole truth; that is, USA Rugby has no sanctioning authority over NCR's domestic events and that the "exclusive" jurisdiction rests with NCR. Equally as telling, when USA Rugby was confronted with the Act's jurisdictional realities, it chose to refuse to accept the law and/or advise anyone of its error to correct the false and defamatory statements. These acts and omissions by USA Rugby constitute fraud by omission and/or fraud.

69.    All of USA Rugby's defamatory statements have intentionally omitted the whole truth regarding the jurisdictional issues under the Ted Stevens Act and, as such, were designed to confuse and mislead the referees and wider rugby community regarding approval and/or

certification. These spurious statements left the mistaken impression that NCR was somehow supposed to have its domestic events sanctioned by USA Rugby and failure to do so resulted in disqualification. At the same time, these defamatory statements intentionally disparaged NCR's business and reputation; all of which constitutes deceptive trade practices. As with the claim of fraud by omission, USA Rugby has had many opportunities to correct the false, confusing, misleading and defamatory statements but, to date, has refused to take any corrective actions. Accordingly, USA Rugby's deceptive trade practices has continued up to the date of filing.

## IV.    LEGAL CLAIMS

70.    The facts and claims set forth in detail above are adopted and incorporated herein as to each of the following legal claims.

### A.  USA Rugby Has Violated The Ted Stevens Act And Controlling Policies:

71.    NCR's threshold issue for the court's declaratory and injunctive relief request concerns the interpretation, application and violations of certain provisions of the Ted Stevens Act. NCR also seeks the court's declaratory and injunctive relief regarding USA Rugby's violations of its policies, as well as World Rugby's and USOPC's policies arising from the Act.

72.    NCR has Exclusive Jurisdiction over its Domestic Competitions under the Act:

(a)    The first statutory language NCR seeks declaratory and injunctive relief for concerns the scope and limitations of USA Rugby's jurisdiction over NCR, its members, referees and/or its operations. NCR submits that, based on the clear and unequivocal language of the Act, USA Rugby knew that its actions and/or inactions violated the applicable provisions of the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C.A. 220501 et seq, including but not limited to sections 220523, 220524, 220525 and 220526 ("Ted Stevens Act" or the "Act"). And, instead of complying with the Act, USA Rugby intentionally chose to ignore the law.

73.     As specifically authorized by the Act, NCR's claims arise in large part from its exclusive jurisdiction to sanction and run domestic college rugby events of its members and USA Rugby's intentional disregard of the Act's limiting jurisdiction provisions which confines its jurisdiction and sanctioning power to "international" competitions between teams and players representing their countries.

74.     As a college amateur athletic organization under the Act, NCR has "exclusive jurisdiction" over all of its domestic competitions and operations. The Act states: "An amateur sports organization that conducts amateur athletic competition ***shall have exclusive jurisdiction over that competition***, if participation is restricted to a specific class of amateur athletics, such as high school students, ***college students,*** members of the Armed Forces or similar groups or categories." 36 U.S.C.A. 220526(a)(emphasis added).

75.     The clear and unequivocal language of section 220526 proves that USA Rugby has absolutely no jurisdiction over NCR's amateur college rugby competitions, including the referees who officiate these competitions and/or other aspects of NCR's operations.

80.  Additionally, under the Ted Stevens Act, USA's authority regarding a sanction request by an amateur athletic college organization is ***strictly*** limited to "international" amateur athletic competition between teams and players representing their respective countries. Section 220525(a)(1). Under the Act, USA Rugby has never had jurisdiction and/or sanctioning authority over any of NCR's matches, tournaments and/or championships, much less its operations.

76.     NCR submits that USA Rugby's ongoing intentional disregard of the specific and limiting provisions of the Act is, in and of itself, a violation of the Act.

77.     NCR seeks the court's declaratory and injunctive relief regarding NCR's exclusive jurisdiction over its competitions and operations and USA Rugby's lack of jurisdiction over NCR over domestic matters, as well as the resulting damages.

78.     USA Rugby has Violated the Ted Stevens Act and Controlling Policies by Wrongfully Attempting to Assert Jurisdiction Over NCR, its Members and Officials:

79.     Since the passage of the Ted Stevens Act in 1998 and its recognition as the national governing body for amateur rugby in the United States, USA Rugby has been obligated to follow the Act.  Despite the clear statutory language regarding NCR's exclusive jurisdiction, USA Rugby has intentionally violated the law by illegally attempting to assert jurisdiction over NCR's collegiate competitions and/or claiming it had authority or sanctioning power over NCR's events and other activities, including officiating.

80.     Beyond USA Rugby's willful disregard of the Ted Stevens Act's jurisdiction limiting provisions, each of these defamatory statements and tortious conduct constitute a separate and ongoing violation of the Act.

81.     USA Rugby's continuing publication of defamatory statements and tortious conduct that NCR's events are "unsanctioned" is nothing more than veiled attempts to convince officials and the wider rugby community that it has both jurisdiction and authority over NCR events; all of which are designed to threaten NCR's exclusive jurisdiction and damage NCR's reputation.

82.     The facts set forth in this Complaint and to be shown at trial show that USA Rugby's deceitful campaign against NCR was and is manifested in a series of tactics used by USA Rugby in its attempt to discredit and harm NCR, including in the wider rugby community.

88. USA Rugby's intentional violations of the Act also violate its own bylaws which specifically adopts the Act.

83.    For example, USA Rugby also cannot prove any controlling policy and/or law which prohibits referees from participating in NCR sanctioned events without the threatened repercussions. Nor can USA Rugby prove a clear and valid procedural basis for the threatened punitive actions against the NCR and/or the referees for their officiating these NCR events. Rather, the clear facts will show that USA Rugby has failed and/or refused to follow its own eligibility polices by not giving the threatened referees or NCR the proper notice and/or the opportunity for an eligibility hearing.

84.    USA Rugby Violated the Ted Stevens Act by Asserting Discriminatory and Unreasonable Sanctioning Fees Against NCR.

85.    Under section 220525 of the Ted Stevens Act, an amateur sports organization may be granted a sanction provided it meets certain requirements including the payment of a "reasonable" and "non-discriminatory" sanctioning fee.

86.    By way of background, all aspects of NCR events, including tournaments and championships, are completely run by NCR, including insurance. USA Rugby has zero input into the running of NCR events.

87.    In NCR's case, the facts will show that USA Rugby not only demanded unreasonable sanctioning fees for its tournaments and championships but that the fees were discriminatory and, as such, violate the Act.

88.    Examples of these violations are USA Rugby's demands to NCR that it pays an excessive sanctioning fee of $10,000 for the CRC and then was asked to pay  $60,000 for next CRC. These excessive sanctioning fees will be shown to have been discriminatorily motivated when compared with similar events.

89.     USA Rugby's Eligibility Threats, Defamatory Statements, and Tortious Conduct Violate the Ted Stevens Act and its Controlling Policies:

90.     NCR does not challenge the general authority of USA Rugby over its determination of eligibility to officiate or play in "international" amateur athletic competitions as defined by the Act; that is, competitions between teams representing their countries. However, this general authority must comply with the law and the limiting jurisdiction provisions of the Act. Equally as important, USA Rugby must be truthful about its own jurisdictional limitations and avoid the disinformation campaign against NCR and the referees, who officiate NCR events.

91.     NCR submits that USA Rugby's intimidation and threats made to numerous referees that they would be ineligible to officiate USA Rugby and/or international matches, as well as being ineligible for the developmental pathway to qualify for international matches, due to the referees' participation in NCR's alleged "unsanctioned" events violates the Ted Stevens Act and controlling policies.

92.     Likewise, USA Rugby's defamatory statements, tortious conduct and deceptive practices beyond the referees includes its ongoing disinformation efforts to World Rugby, Rugby Canada and Major League Rugby regarding the alleged "unsanctioned" NCR events. Each and everyone of these statements constitute a separate and distinct tort and, as such, they serve as a basis for NCR's claims for declaratory and injunctive relief, as well as damages.

93.     USA Rugby's Failure to Follow its Eligibility Dispute Resolution Procedures Violates the Ted Stevens Act and its Own Policies:

94.     The Ted Stevens Act's primary purpose is to govern international amateur athletics under the USOPC and, in turn, the national governing bodies ("NGB"). As part of the Act's provisions,

the NGB is supposed to establish a mechanism for resolving eligibility disputes for international competitions and other international aspects arising under the Act.

95.    NCR contends that, in regard to eligibility disputes arising from the threatened ban on officials for NCR events, USA Rugby did not follow its own eligibility dispute procedures and, as such, USA Rugby has and continues to be in violation of the Act and controlling policies.

96.    Section §220524 of the Ted Stevens Act mandates national governing bodies ensure effective communication and provide due process to athletes and others, including referees. In turn, USA Rugby adopted eligibility dispute resolution policies and procedures which require proper written notice of an eligibility infraction or violation and, most importantly, an opportunity for a hearing.

97.    Instead of complying with the Act and/or its own eligibility policies, USA Rugby intentionally avoided these requirements by failing to give proper notice to NCR and/or the various referees of any valid eligibility infractions or an opportunity to have an eligibility hearing on the purported infractions. Two examples of these violations were the failure to give either Justin Hale or Chris Micheletti proper notice or an opportunity to have a hearing.

98.    NCR submits that these failures were intentional because had USA Rugby given proper notice to NCR and/or the referees and held hearings they would have been forced to admit that NCR has exclusive jurisdiction over its events and any referees' participation, including sanctioning of those NCR events and, as such, officiating an NCR event is not a disqualifying factor for eligibility.

99.    In addition to these eligibility procedures, if USA Rugby had a valid and legitimate basis for asserting any eligibility infractions for officiating NCR events, it could have instituted its grievance process by filing complaints against the referee members. NCR submits that USA Rugby

intentionally avoided asserting this grievance process because, once again, any hearing would show its lack of jurisdiction over NCR and its events, including officials.

106. NCR submits that USA Rugby's intentional refusal to follow the provisions of the Act and/or its own policies are violations of the Act and controlling policies which, in turn, led to NCR's claims and damages.

100.    USA Rugby's Dispute Resolution Procedures Do Not Apply to NCR's Claims:

101.    Under the Ted Stevens Act, USA Rugby is supposed to establish dispute resolution procedures for matters which fall within the purview of the statute. Section 220524. However, USA Rugby's eligibility and grievance procedures are only open to members. And, since NCR is not a member of USA Rugby, it cannot file a complaint under USA Rugby's procedures.

102.    USA Rugby's grievance procedures are also inapplicable because they are limited to "procedural" matters and, as such, do not address the multitude of substantive issues raised by Plaintiff's claims, including the "exclusive" jurisdiction issues presented by NCR's claims.

103.    Apart from USA Rugby's dispute resolution procedures not being able to address the "exclusive" jurisdiction issue, these procedures cannot govern NCR's claims of tortious interference and/or defamation and/or deceptive trade practices it has made against USA Rugby.

104.    Alternatively, NCR's multiple attempts to resolve these issues, including the mediation in Washington D.C., has met or exceeded the resolution requirements under USA Rugby's procedures and, as such, any claim that NCR has not engaged in dispute resolution efforts is spurious

105.    Under the Act, USOPC's Dispute Resolution Procedures are Permissive and Do Not Apply to all of NCR's Claims:

106.    Under section 220527(a)(1), an amateur sports organization which is eligible to be a member of a national governing body "**may**" seek to compel the NGB to comply with section 220522(eligibility), 220524 (general duties) and 220525(sanctioning) by filing a complaint with the USOPC.

107.    The language of section 220527 shows that it is permissive and, as such, gives NCR the option to file a complaint with the USOPC against USA Rugby for the limited sections listed. There is no language in this section or any other section of the Act which mandates NCR file a complaint with the USOPC before pursuing its claims.

108.    Equally as important, section 220527 does not list either section 220523 (NGB authority) or section 220526 (exclusive jurisdiction) as a basis for filing a complaint with the USOPC. Accordingly, under 220527, NCR is not required to file a complaint against USA Rugby with the USOPC for USA Rugby's violations of the Act.

109.    The limited scope of section 220527 does not cover NCR's threshold issue presented to the court; that is, the Act's exclusive jurisdiction of an amateur college athletic organization, such as NCR, over its competitions.

110.    NCR's Federal and State Law Claims are Not Preempted by the Ted Stevens Act:

118. NCR anticipates that USA Rugby will attempt to argue and raise preemption as a defense to its federal and state law claims. The plain language of the Ted Stevens Act will show that this argument and defense is without merit.

111.    Under section 220505(b)(9), the Act does not create a "private cause of action" against the "corporation" which the Act defines as the USOPC. This limitation language does not extend to an NGB, like USA Rugby. Moreover, this limitation language has been judicially determined to only apply to those acts or omissions which arise under the Act.

112.    Any argument by USA Rugby that this "private right of action" language preempts NCR's federal and state law claims also ignores the clear language of the Act and that the section only applies to the USOPC.

113.    Contrary to USA Rugby's potential preemption defense, the Act specifically does not preempt either "state law" or "common law" duty of care of USA Rugby. Section 220524(b) of the Act which applies to a national governing body specifically states that "***Nothing in this section shall be construed as preempting or abrogating the duty of care under state law or common law.***" The tortious, retaliatory and discriminatory nature of Defendants' acts and/or omissions clearly fall within USA Rugby's "duty of care" under state or common law.

114.    Likewise, section 220505(d)(3) which applies to the USOPC has the following preemption language: "***Nothing in this subsection shall be construed as preempting or abrogating the duty of care under state law or common law.***"

115.    Defendants have clearly acted well beyond USA Rugby's statutory authority by unilaterally interfering with the sanctioning, officiating and participation of NCR's rugby events. These actions directly contradicted the responsibilities and powers outlined under §220523 of the Ted Stevens Act. This section grants national governing bodies the authority to represent the U.S. in international sports federations, sanction "international" competitions, and coordinate "international" athletic eligibility or activities.

### B.  USA Rugby Tortious Interference of NCR's Business Relationships and Contracts:

116.    NCR submits that USA Rugby's intentional acts and/or omissions constitute past and ongoing tortious interference with NCR's existing and prospective business relationships within the rugby refereeing community, as well as past and prospective contracts. These actions have caused significant damages to NCR's business relationships and reputation.

117.    Rugby officiating contracts, particularly at the college and national levels, are governed by both verbal and written contractual agreements. NCR had and has valid business expectations with various rugby referee organizations for officiating assignments.

118.    USA Rugby was well aware of NCR's existing and ongoing agreements with these referee organizations and others. USA Rugby was also aware of the scope and limitations of their authority and/or jurisdiction over domestic college amateur athletic competitions, including the sanctioning limits under the Ted Stevens Act, World Rugby, USOPC and its own policies.

119.    Despite this statutory knowledge, USA Rugby intentionally chose to violate the law by engaging in an ongoing series of deceptive tactics through their acts and/or omissions outlined in detail in this complaint and a pattern of disinformation regarding NCR's own exclusive sanctioning authority over its domestic competitions, as well as other misinformation about NCR.

120.    The scope of this tortious interference in both business relationships and contracts went beyond the referees and includes the relationships and potential contracts with Major League Rugby, World Rugby, Rugby Canada, sponsors and other individuals and/or business entities to be shown at trial.

121.    USA Rugby's ongoing tortious interference of NCR's business relationships and contracts has resulted in NCR suffering and continuing to suffer reputational damages and economic loss, as well as any special damages allowed by law.

**C. USA Rugby's Defamation and Fraud by Omission**:

122.    The facts set forth above in greater detail and as the evidence at trial will show that USA Rugby has and continues to intentionally publish and/or make false and/or disparaging statements against NCR and, as a result, NCR has suffered and continues to suffer both reputational harm and economic loss or damages.

123.    One of the main defamatory statements is USA Rugby's meritless claim that NCR events, including its championships, are "unsanctioned." To members of public outside of rugby, USA Rugby's issuance of these "unsanctioned" statements may seem to be innocuous. However, to NCR, its member colleges, member players, its contracted officials and the wider rugby community, the claim by USA Rugby, as the national governing body, that NCR events are not "sanctioned" is highly defamatory.

124.    This labelling of NCR events as "unsanctioned" within the rugby community was intended to have a negative impact on NCR's reputation and, in turn, NCR's business and contracts. One need look no further than the Cambridge Dictionary to see the intended impact of these statements. Cambridge defines "unsanctioned" as "not officially allowed or approved." This deceptive moniker was used and is being used to in effect label NCR as an outside rogue organization.

125.    This label is intentionally misleading by design because had USA Rugby told the whole truth that, under federal law, NCR has "exclusive" jurisdiction over its events, including sanctioning of those events, the various statements would be rendered meaningless. Moreover, the defamatory label purposely avoids the fact that, under federal law, USA Rugby has absolutely no jurisdiction and/or sanctioning authority over NCR's domestic events.

126.    USA Rugby's publication of false and disparaging statements, both verbally and in writing, against NCR, intentionally omits from any of these statements the simple fact that, under the Ted Stevens Act, USA Rugby has no jurisdiction and/or sanctioning authority over NCR's domestic events and that, under this law, NCR has "exclusive" jurisdiction. USA Rugby's intentional omissions of any reference to NCR's federally mandated "exclusive' jurisdiction constitutes fraud by omission and/or other fraud.

127.    The primary basis for USA Rugby's false and disparaging statements is its willful refusal to accept and acknowledge that, under the Ted Stevens Act, NCR has "exclusive" jurisdiction over its college events, including the sanctioning of these events. Under the Act, USA Rugby had and has no basis for making the false and disparaging statements that NCR events were "unsanctioned."

128.    Under the clear provisions of the Act, USA Rugby had and has no jurisdiction or sanctioning authority over NCR's college championships, events and/or operations. Rather than accept the legal limitations of the Act and publish the whole truth about NCR's jurisdiction and authority, USA Rugby has intentionally chosen to ignore these limitations and omit them from any defamatory statement about NCR. These intentional omissions amount to fraud by omission and/or fraud.

129.    As set forth in greater detail above, USA Rugby's ongoing publication of defamatory statements, both verbally and in writing, about NCR began with Jamie McGregor's various statements to a multitude of referees and other rugby organizations beginning in 2021 including Justin Hale, Christpher Micheletti, the members of USA Rugby's Referee and Laws Committee, Rugby Canada and World Rugby, as well as many others.

130.    These defamatory statements continued with USA Rugby's CEO, COO, Chairman of the Board, Board members and members of the College Council publication and/or reiteration of these false statements, including at the time of the mediation in Washington D.C. and continued after their receipt of NCR's cease and desist letter.

131.    These defamatory statements went well beyond the false statements regarding the "exclusive" jurisdiction issue and included but is not limited to false and disparaging comments

about the safety of NCR matches, inability to comply with the Safe Sports Act, and a variety of other false and/or misleading statements about NCR.

132.    Once these USA Rugby officers, Board members and College Council members learned of the false impression their defamatory statements had on referees and the wider rugby community, they had an affirmative duty to disclose the whole truth to the referees and the entire rugby community and avoid any further publication of the false statements, as well as instruct its employees, volunteers and others to stop making the defamatory statements. Rather than disclose the whole truth about USA Rugby's limited jurisdiction over international matters and NCR's exclusive jurisdiction over its domestic competitions, these individuals chose to remain silent. This silence constitutes fraud by omission and/or fraud.

133.    USA Rugby's false and disparaging statements were used to threaten and/or intimidate referees and hinder NCR's running of its championships and/or events; all of which were part of USA Rugby's tactics to force NCR to either rejoin USA Rugby or accept their onerous terms to resolve these issues.

134.    The cumulative and ongoing impact of these defamatory statements and failure to disclose the whole truth about NCR's exclusive jurisdiction and USA Rugby's limited jurisdiction to international events has seriously damage NCR's reputation and caused economic damages, as well as tortiously interfere with NCR's business relations and its past and prospective contracts

135.    USA Rugby's intentionally defamatory statements and intentional omission of critical facts should also subject USA Rugby to both special and exemplary damages. NCR requests an award of special and exemplary damages to fully compensate NCR and, equally as important, to deter USA Rugby and its minions from continuing its defamatory acts and/or omissions in the future. While NCR acknowledges that special and exemplary damages reach beyond general damages,

NCR submits that USA Rugby's flaunting of its alleged authority over NCR and/or its referees is so egregious that such damages are warranted.

### D.  USA Rugby has Violated the Deceptive Trade Practices Act:

136.    NCR specifically adopts by reference and incorporates herein the facts and claims set forth above. The facts and claims set forth above in greater detail and as the evidence at trial will show that USA Rugby has engaged in deceptive trade practices by continuing to intentionally publish and/or make false and/or disparaging statements and failing to disclose the whole truth regarding NCR's exclusive jurisdiction. *Tex. Bus. & Com. Code 17 sub-chp. E, 17.01 et seq.* ("DTPA").

137.    Under the DTPA, it is considered unlawful to disparage the goods and/or services of a business of another by false or misleading representation of facts. DTPA 17.46(8).

138.    The DTPA also considers it unlawful to cause confusion as to the source, sponsorship approval or certification of goods or services. DTPA 17.46(2).

139.    The DTPA also considers it unlawful to cause confusion or misunderstanding as to the affiliation, connection, association with or certification of another. DTPA 17.46(3).

140.    Under the DTPA, NCR is a business consumer for the services it has requested and/or attempted to request for Texas events and/or use of referees in Texas, including such requests for its member colleges in Texas and their players or coaches.

141.    As recently as December 2024, NCR's attempts to contract for the referee services in its Houston championships was impacted by USA Rugby's ongoing efforts to disparage NCR's ability to provide competent and qualified services by issuing false and defamatory statements, as well as failing to disclose the whole truth.

142.    USA Rugby's defamatory statements and their intentional choice to not tell the whole truth about NCR's "exclusive" jurisdiction as described in detail above was intentionally designed to

confuse the referees and wider rugby community and foster a misunderstanding of NCR's affiliation by trying to create the false impression that NCR needed approval and/or certification from USA Rugby to have its events sanctioned.

143.    The confusion and misunderstanding created by USA Rugby's defamatory and misleading statements was and is wide spread. Ranging from Christopher Micheletti being told by Rugby Canada and Major League Rugby that the sanctioning issue impacted his ability to referee matches to World Rugby advising referees not to participate in NCR's "unsanctioned" events, USA Rugby's campaign of misinformation and disinformation against NCR has resulted in economic loss and damages.

144.    USA Rugby's acts and omissions surrounding the ongoing issuance of defamatory statements about NCR was intentional and willful, especially after receipt of NCR's cease and desist letter and/or the letter from their Referee & Law Committee. Rather than take any action to correct the confusion and misunderstanding created by the defamatory statements by issuing a complete and truthful statement and stop issuance of the false statements, USA Rugby intentionally chose to continue to disparage NCR's business and its services.

145.    As a result of these ongoing defamatory statements by USA Rugby, NCR requests that the court find that USA Rugby has intentionally engaged in deceptive trade practices and, as such, USA Rugby should be enjoined from issuing any future defamatory statements about NCR, as well as award damages for economic loss, lost business opportunity, attorney fees and costs and any other special and/or exemplary damages allowed by law.

## V.    PRAYER FOR RELIEF

146.    Plaintiff National Collegiate Rugby Inc. respectfully requests the following relief:

**Compensatory Damages**: $500,000 for past, present and future loss of income, economic loss and reputational harm.

**Public Apology**: Require Defendant Jamie McGregor and USA Rugby to issue a public apology addressing the wrongful actions and the harm that they caused. This apology should be distributed to all USA Rugby members, all referees who have worked for and/or are eligible to work for USA Rugby, World Rugby, Major League Rugby, Rugby Canada, all forms of media outlets and the wider rugby community and it is to be posted on all media platforms, including but not limited to all websites social media accounts managed by USA Rugby and its affiliates, such as Facebook, Instagram, Rugby Xplorer, and all mailing lists.

**Declaratory Relief**: Declare Defendants' actions to be in violation of Plaintiff's rights under the Ted Stevens Act, World Rugby/USOPC/USA Rugby policies and other relevant laws as set forth herein and/or to be shown at trial.

**Injunctive Relief:** Enjoin the Defendants from any further violations of the Ted Stevens Act, World Rugby/USOPC/USA Rugby policies and/or making the defamatory statements and/or tortious interference set forth in this Complaint, including violations of the deceptive trade practices act, any retaliatory acts, any discriminatory acts and/or others to be shown at trial.

**Special Damages- Legal Fees and Costs**: Award reasonable attorney's fees, legal costs, and expenses, as well as other special damages allowed by law, including treble damages under the deceptive trade practices act.

**Exemplary damages**: As allowed by law, exemplary damages in an amount to be determined at trial to punish Defendants for their egregious and intentional conduct and deter similar behavior in the future.

**Treble Damages**: The Texas Deceptive Trade Practices Act permits the recovery of treble damages when a defendant commits an intentional violation. Plaintiff seeks to recover treble damages for Defendants' intentional violations of the DTPA.

**Any Other Relief**: Award any other relief deemed just and proper under equity and law.

## VI.    CONCLUSION

WHEREFORE, Plaintiff, National Collegiate Rugby respectfully requests that the Court consider the detailed factual allegations and supplementary evidence provided in this Complaint. These facts and documentation clearly support the claims of violations of the Ted Stevens Act, World Rugby/USOPC/USA Rugby policies, deceptive trade practices, intentional defamation, and tortious interference by Defendants Jamie McGregor and USA Rugby. Furthermore, Plaintiff seeks damages, declaratory relief, injunctive relief, and any other appropriate relief as equity and justice allow.

Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH, LLP

*/s/ Matthew R. Begley*
**MATTHEW R. BEGLEY**
Texas Bar No. 24076265
Matthew.Begley@lewisbrisbois.com
24 Greenway Plaza, Suite 1400
Houston, Texas 77046
(713) 659-6767—Telephone
(713) 759-6830—Facsimile

And

**GREGG E. CLIFTON**
Arizona Bar No. 028893
Gregg.Clifton@lewisbrisbois.com
Phoenix Plaza Tower II
2929 North Central Avenue, Suite 1700
Phoenix, Arizona 85012-2761
(602) 385-1040—Telephone
(602) 385-1051—Facsimile

*Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR PLAINTIFF,
NATIONAL COLLEGIATE RUGBY, INC.**